**This order is SIGNED.**





**Dated: January 12, 2017**

**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | |
| Mineral Resources International, Inc., | Bankruptcy Case No. 13-30606 |
| Debtor. | Chapter 11 |
| | |
| Mineral Resources International, Inc., | Hon. R. Kimball Mosier |
| Plaintiff, | |
| v. | |
| Trace Minerals Research, L.C., | Adversary Proceeding No. 15-2151 |
| Defendant. | |

### MEMORANDUM DECISION

The matter before the Court is the motion for summary judgment filed by the Plaintiff, Mineral Resources International, Inc. (MRI). Through the motion, MRI seeks to disallow proof of claim #22-1, filed by Trace Minerals Research, L.C. (TMR).

After considering the relevant filings in this adversary proceeding, including MRI's motion and supporting memorandum, TMR's memorandum in opposition, and the parties' supplemental briefing; after considering the oral arguments of counsel; and after conducting an

independent review of applicable law, the Court issues the following Memorandum Decision.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law

pursuant to Federal Rule of Civil Procedure 52(a), made applicable in adversary proceedings

through Federal Rule of Bankruptcy Procedure 7052.[1]

## I. JURISDICTION

The Court's jurisdiction over this adversary proceeding is properly invoked pursuant to

28 U.S.C. § 1334 and § 157(b)(1). This matter is a core proceeding within the definition of 28

U.S.C. § 157(b)(2)(B), and the Court may enter a final order. Venue is appropriate under 28

U.S.C. § 1409.

## II. DISCUSSION

Under Federal Rule of Civil Procedure 56(a), made applicable in adversary proceedings

by Federal Rule of Bankruptcy Procedure 7056, the Court is required to "grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."[2] Substantive law determines which facts are

material and which are not. "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment."[3] Whether a

dispute is "genuine" turns on whether "the evidence is such that a reasonable [fact finder] could

return a verdict for the nonmoving party."[4] In sum, the Court's function at the summary

judgment stage is to "determine whether there is a genuine issue for trial."[5]

---

[1] Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any conclusions of law are similarly deemed, to the extent appropriate, to be findings of fact, and they shall be equally binding as both.
[2] Fed. R. Civ. P. 56(a).
[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[4] *Id.*
[5] *Id.* at 249.

The moving party bears the burden to show that it is entitled to summary judgment,[6] including the burden to properly support its summary judgment motion as required by Rule 56(c).[7] If the moving party has failed to meet its burden, "summary judgment must be denied," and the nonmoving party need not respond because "no defense to an insufficient showing is required."[8] Once the moving party meets its initial burden, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."[9] The nonmoving party may not rely solely on allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."[10] The nonmoving party also "must do more than simply show that there is some metaphysical doubt as to the material facts."[11]

When considering a motion for summary judgment, the Court views the record and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party,[12] but the Court does not weigh the evidence or make credibility determinations.[13]

Based on the record before it, the Court finds that the following facts are undisputed:

1. MRI filed the current chapter 11 bankruptcy case on September 16, 2013.

2. On January 20, 2014, TMR filed proof of claim #22-1 in the amount of $350,000. The asserted basis for the claim is "[d]amages for defamation/unfair competition."

3. MRI filed an objection to that proof of claim on August 11, 2014.

---

[6] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[7] *See Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002).

[8] *Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

[9] *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).

[10] *Celotex*, 477 U.S. at 324.

[11] *Matsushida Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[12] *E.g.*, *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citation omitted).

[13] *Nat'l Am. Ins. Co. v. Am. Re-Insurance Co.*, 358 F.3d 736, 742-43 (10th Cir. 2004) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994)).

4.  The alleged instances of defamation are limited to three publications: a paper written by Wade C. Roberts, Ph.D., called *Extracting Minerals from the Great Salt Lake: Great Find or Great Fraud?* (Roberts Paper) and two videos featuring John Heinerman posted to YouTube called *Trace Minerals Research: The Truth Revealed* and *Trace Minerals Research: The Truth Revealed Part II* (Heinerman Videos).[14]

5.  MRI assisted Mr. Heinerman in producing the Heinerman Videos.

6.  MRI published the Roberts Paper on its website, in several press releases, in a newsletter, and in an email blast on July 26 and 27, 2010.

7.  MRI republished the Roberts Paper in August 2010.

8.  The First Heinerman Video was published on YouTube in April 2011. MRI published links to that video on its own website shortly thereafter.

9.  The Second Heinerman Video was published on YouTube in August 2011. MRI again published links to that video on its own website shortly thereafter.

10. The Roberts Paper and the Heinerman Videos were on MRI's website on the petition date.

MRI's complaint seeks disallowance of TMR's claim under 11 U.S.C. § 502(b)(1).[15] In resolving a claim objection under that provision, the Court must "determine the amount of such claim . . . as of the date of the filing of the petition" and "allow such claim in such amount, except to the extent that— (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is

---

[14] When necessary, the Court will refer separately to *Trace Minerals Research: The Truth Revealed* as the "First Heinerman Video," and *Trace Minerals Research: The Truth Revealed Part II* as the "Second Heinerman Video."

[15] All subsequent statutory references are to title 11 of the United States Code unless otherwise indicated.

contingent or unmatured."[16] TMR has properly filed its proof of claim, which is *prima facie* evidence of its validity and amount under Rule 3001(f).

> [T]he well-established burdens of proof provide that the objecting party has the burden of going forward with evidence supporting the objection. Such evidence must be of probative force equal to that of the allegations contained in the proof of claim. However, an objection raising only legal issues is sufficient. Once the objecting party has reached this threshold, the creditor claimant has the ultimate burden of persuasion as to the validity and amount of the claim. The standard of proof is a preponderance of the evidence.[17]

MRI argues that TMR's proof of claim is unenforceable and should be disallowed for two reasons: (1) TMR previously agreed to release and waive the damage claims asserted in its proof of claim; and (2) the claim is barred by the applicable statute of limitations. These reasons are asserted as independent bases to disallow TMR's claim. The Court will address the statute of limitations argument first.

TMR's claim is based on alleged instances of defamation and unfair competition under Utah law. Although TMR has not often invoked specific statutes in support of its unfair competition claim, it did state in its answer that it "is seeking statutory damages for its claim of unfair competition," then cited to Utah Code Annotated § 13-5-14,[18] which provides for injunctive relief and the award of damages. In addition, at oral argument TMR referred the Court to Utah Code Annotated § 13-5-17 to support its assertion that it has a claim for unfair competition. Utah Code Annotated § 13-5-1 *et seq.* is the Utah Unfair Practices Act. Claims under that Act can be referred to as claims for unfair competition,[19] which could create confusion since Utah Code Annotated § 13-5a-101 *et seq.* is the Utah Unfair Competition Act.

---

[16] § 502(b)(1).

[17] *In re Castle Arch Real Estate Inv. Co.*, No. 11-35082, 2013 WL 1603319, at *8 (Bankr. D. Utah Apr. 15, 2013) (citations and internal quotation marks omitted).

[18] Docket No. 3, Answer to Complaint, ¶ 13.

[19] *See, e.g.*, *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1157-58 (10th Cir. 2013).

Nevertheless, given TMR's statutory references, it appears that TMR's unfair competition claim is based on the Utah Unfair Practices Act.[20]

Utah law prescribes a one-year statute of limitations for defamation claims.[21] Determining the statute of limitations for TMR's unfair competition claim requires a deeper analysis. TMR argues that because the unfair competition claim is a statutory cause of action, the applicable statute of limitations must be three years under Utah Code Annotated § 78B-2-305(4).[22] While that is the general rule for statutory causes of action, there is a specific exception for cases that involve defamation claims. The Utah Court of Appeals has stated that "[t]o ensure that claims with defamation underpinnings are not recast and cleverly titled in order to sidestep the one-year limitations period, [the Utah] Supreme Court has stated that 'the statute of limitations for defamation governs claims based on the same operative facts that would support a defamation action.'"[23] Therefore, the Court must determine whether the unfair competition claim arises out of the same operative facts that would support a defamation claim.

TMR argues that the unfair competition claim does not arise out of the same operative facts because it is based on a statement in the Roberts Paper that differs from the statement that supports the defamation claim. According to TMR, the statement that forms the basis of the unfair competition claim is that only MRI implements a traditional solar-evaporation technology

---

[20] The Court will continue to refer to TMR's claim as one for unfair competition to remain consistent with the parties' usage.

[21] *Jensen v. Sawyers*, 130 P.3d 325, 332 (Utah 2005).

[22] That section provides that "[a]n action may be brought within three years: . . . for a liability created by the statutes of this state, other than for a penalty or forfeiture under the laws of this state, except where in special cases a different limitation is prescribed by the statutes of this state." In the alternative, TMR argues that because the unfair competition claim appears to be for a penalty or forfeiture, the four-year "catch-all" statute of limitations under Utah Code Ann. § 78B-2-307(3) applies. Determining whether the three-year or four-year statute controls is not material to this decision.

[23] *Bates v. Utah Ass'n of Realtors*, 297 P.3d 49, 50 (Utah Ct. App. 2013) (quoting *Jensen*, 130 P.3d at 336).

when transforming water from the Great Salt Lake into concentrated mineral form, only MRI sells food-grade product, and consumers lack the ability to differentiate between food-grade and non-food-grade product. TMR contrasts this with the statement in the Roberts Paper that TMR purchases non-food-grade product and markets it as food-grade in order to compete with MRI, which forms the basis of the defamation claim.

At the outset, the Court is not convinced that the Unfair Practices Act supports TMR's unfair competition claim. The Act "disallows the use of a list of specific unfair trade practices by persons 'engaged in commerce,' including anti-competitive price discrimination, advertising or sale of goods at a price less than cost, and advertising goods, wares, or merchandise that the advertiser is not prepared to supply."[24] None of those practices applies to the statement in the Roberts Paper. By asserting an unfair competition claim under the Act based on the facts alleged, TMR is essentially arguing that the Act encompasses claims akin to false advertising. But the Act was enacted to cover a different kind of conduct than the one TMR complains of—namely, the kind of economic behavior that one typically encounters in the realm of antitrust law. As the Utah Supreme Court stated:

> The immediate stimuli for the enactment of such acts were in part the rapid rise of chain stores, and in part the general sharpening of competitive practices under pressure of the depression. . . . One of the practices aimed at by these Unfair Practices Acts statutes is that, common in chain stores, of selling at lower prices in one locality than in another and making up losses incurred by profits in other stores. Even more important in the application of anti-discrimination statutes today is the prevention of discrimination sales by manufacturers to customers with unusually strong bargaining power who can force large price concessions.[25]

---

[24] *MacArthur v. San Juan County*, 416 F. Supp. 2d 1098, 1179 (D. Utah 2005) (citations omitted); *see also Garrard v. Gateway Fin. Servs., Inc.*, 207 P.3d 1227, 1229-30 (Utah 2009) ("[T]he [Unfair Practices] Act prohibits anticompetitive discriminatory pricing and advertising goods the retailer is not prepared to supply. . . . [W]e find it unambiguous that the legislature intended the Act to apply only to anticompetitive behavior.").

[25] *Burt v. Woolsulate, Inc.*, 146 P.2d 203, 205 (Utah 1944) (citation and internal quotation marks omitted).

While TMR invokes the Act's broadly-worded policy provision in an attempt to apply the Act to this case,[26] that avenue is foreclosed if the Act does not cover the specific conduct at issue. As stated in *MacArthur*, "[n]either the Act's general purpose 'to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition' nor the 'liberal construction' of its terms can extend civil liability—or the Act's criminal sanctions—beyond the 'unfair and discriminatory practices' expressly 'prohibited' by the Act itself."[27] TMR has not referred to a specific section of the Act that would apply to the statement in the Roberts Paper, and this Court cannot find one. Therefore, the Court concludes that TMR does not have a claim under the Utah Unfair Practices Act based on the facts alleged. Without a claim, the three-year statute of limitations pertaining to statutory causes of action cannot apply to the statement in the Roberts Paper.

Even assuming, for the sake of argument, that the Act applied to the statement in the Roberts Paper, the Court concludes that the unfair competition claim is based on the same operative facts that would support a defamation action. The statements on which TMR bases its unfair competition claim and defamation claim occur on the same pages of the Roberts Paper.[28] Their proximity and the fact that they address the same topic—*i.e.,* the nature of MRI's and TMR's products—suggest that the statements should be viewed together. When viewed in that way, they give the impression that MRI's product is superior, TMR's product is inferior, and that TMR attempts to conceal that fact. But TMR's attempt to divide the statements overlooks their

---

[26] *See* Utah Code Ann. § 13-5-17 ("[T]he purpose of this act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. This act shall be liberally construed that its beneficial purposes may be subserved.").
[27] *MacArthur*, 416 F. Supp. 2d at 1181; *see also Icon Health & Fitness, Inc. v. Relax-a-Cizor Prods., Inc.*, No. 1:12-CV-00017-EJF, 2014 WL 29002, at *3 (D. Utah Jan. 2, 2014) ("Because of the specificity of the UUPA, courts have interpreted the UUPA narrowly.").
[28] The statements occur on the first and last pages of the Roberts Paper.

interdependence. The purpose of the statement that TMR sells non-food-grade product and markets it as food-grade is to suggest that TMR is dishonest and its product should not be trusted. But the force behind that statement is multiplied considerably when the statement is linked to the statement that consumers cannot tell the difference between food-grade and non-food-grade product. This suggests that TMR is getting away with its dishonesty by taking advantage of unwary customers. Together, these statements paint TMR in a more disparaging light than either could do alone. And that light is amplified further still when those statements are joined to the statements that MRI is the only entity that sells food-grade product and the only entity that employs traditional solar-evaporation technology to obtain that product. As a whole, these statements contrast TMR with MRI, which is portrayed as an honest company that uses wholesome methods—connoted by the word "traditional"—to extract minerals from the Great Salt Lake. The statements TMR has identified are intended to reinforce each other and lead the reader to a certain conclusion about the relative merits of these companies and their products. They are part of the same paper and part of the same topic of discussion. To divide them and argue that certain statements support an unfair competition claim is to recast the claim in the way precluded by Utah law. They are part of the same operative facts, which could support a defamation claim. Consequently, the statute of limitations for defamation governs the unfair competition claim.

"Generally, a cause of action accrues and the relevant statute of limitations begins to run upon the happening of the last event necessary to complete the cause of action."[29] However, there is an exception to this general rule under Utah law. In defamation cases, the one-year statute of limitations does not begin to run until the defamatory statement "is known or is

---

[29] *S & G Inc. v. Intermountain Power Agency*, 913 P.2d 735, 740 (Utah 1996) (citation and internal quotation marks omitted).

reasonably discoverable by the plaintiff."[30] But a statement in an aggregate publication—one that is distributed to multiple persons, such as a single edition of a book, newspaper, or magazine—is reasonably discoverable as a matter of law when it is first published and widely disseminated to the public.[31] This is known as the "single publication rule," under which an "aggregate communication can give rise to only one cause of action in the jurisdiction where the dissemination occurred, and result in only one statute of limitations period that runs from the point at which the original dissemination occurred."[32] As the age of mass communication advanced, the single publication rule displaced the common law multiple publication rule,[33] which provided that "each communication of a defamatory statement to a third person constituted a separate publication giving rise to a new cause of action."[34] If that rule were applied to mass communications, it would result in several negative consequences, including "permit[ting] a multiplicity of actions, leading to potential harassment and excessive liability, and draining of judicial resources," as well as the "potential for endless retriggering of the statute of limitations."[35] As a result, the single publication rule has been applied consistently to mass communications, including printed media and more modern forms of publication such as radio and television broadcasts.[36] Over the past two decades, courts have begun to address whether it should be extended to the most ubiquitous modern form of publication—the Internet.[37]

---

[30] *Allen v. Ortez*, 802 P.2d 1307, 1314 (Utah 1990).

[31] *Russell v. Standard Corp.*, 898 P.2d 263, 264 (Utah 1995).

[32] *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1130 (9th Cir. 2006).

[33] *See Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 502-03 (6th Cir. 2015) (detailing the history of the multiple publication rule).

[34] *Firth v. State*, 775 N.E.2d 463, 465 (N.Y. 2002).

[35] *Id.* at 465-66.

[36] *See* Restatement (Second) of Torts § 577A cmt. c (Am. Law. Inst. 1977) ("The single publication rule applies also to the issue of any one edition of a newspaper, magazine or book; to any one broadcast over radio or television; to any one exhibition of a motion picture.").

[37] *See Clark*, 617 F. App'x at 503-04 (collecting cases).

The Roberts Paper and the Heinerman Videos were posted on the Internet. The Court therefore must resolve whether Utah would apply the single publication rule or the multiple publication rule to those postings. "When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule."[38] If the highest state court has not yet issued a decision on the issue in question, "federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State."[39] The parties have not provided in their briefs, and this Court has not found in its independent research, a Utah Supreme Court or Court of Appeals case that either adopts or rejects the single publication rule with regard to alleged defamatory publications made on the Internet.

The parties have provided a case from the U.S. District Court for the District of Utah, however, which addressed this precise issue. In *Diamond Ranch Academy, Inc. v. Filer*,[40] Judge Campbell predicted that the Utah Supreme Court would apply the single publication rule to Internet publications.[41] This Court agrees and adopts Judge Campbell's reasoning in *Diamond Ranch Academy* on this issue as its own. The Court believes that this result comports with the policy reasons underlying the one-year statute of limitations for defamation claims:

> This unusually short limitations period is explained by the fact that defamation claims regularly collide with free speech interests and "always reside in the shadow of the First Amendment." The shorter time period in which "those making statements are exposed to legal challenges reduces the chilling effect on speech that may accompany the prospect of defending statements well beyond their shelf lives."[42]

---

[38] *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002).

[39] *Id.* at 1119.

[40] *Diamond Ranch Acad., Inc. v. Filer*, No. 2:14-CV-751-TC, 2016 WL 633351 (D. Utah Feb. 17, 2016), *appeal docketed*, No. 16-4034 (10th Cir. Mar. 18, 2016).

[41] *Id.* at *9.

[42] *Bates*, 297 P.3d at 50 (quoting *Jensen*, 130 P.3d at 336-37).

**A. The Multiple Publication Rule Does Not Apply to Publications That Are Merely "Publicly Unavailable."**

TMR concedes that the Utah Supreme Court would likely follow the single publication rule for Internet publications, but argues that the multiple publication rule still applies to Internet publications available only through restricted-access online databases. Accordingly, because TMR asserts that the Roberts Paper is behind a login page on MRI's website and therefore not publicly available, TMR argues that it is subject to the multiple publication rule. As a consequence, each time a person accesses the Roberts Paper, it would constitute a separate publication and set the statute of limitations running anew. The Court disagrees for two reasons.

First, the undisputed facts show that the Roberts Paper does not exist behind a login page on MRI's website. The Roberts Paper was published on MRI's website in July 2010 and was publicly available at that time. MRI has come forward with evidence showing that in 2013 MRI directed the webmaster to take the Roberts Paper down from its website. The webmaster complied, but the link to the Roberts Paper remained, which, when clicked, directs a person to a login page. MRI's evidence further showed that the Roberts Paper is not available behind that login page. Instead, the login page is a "glitch" in the software that hosts MRI's website: When an article is taken down, the link for that article goes to the login page by default. In other words, if a link to an article on MRI's website leads to the login page, it does not necessarily mean that the article exists beyond the login page. And in this instance, had a person logged in to MRI's website, she would not have found the Roberts Paper. TMR did not dispute this evidence or offer evidence to the contrary. Therefore, the undisputed evidence the Court has before it on summary judgment regarding the Roberts Paper is that it was publicly available in July 2010 on MRI's website, that it was removed in 2013, and that after removal it was not available through a

restricted-access login page. TMR's argument that the multiple publication rule applies to the Roberts Paper fails on the facts of the case.

Second, even if the Roberts Paper did exist behind MRI's login page, TMR's argument would fail on the law. In support of its argument, TMR cites to *Nationwide Bi-Weekly Administration, Inc. v. Belo Corp*,[43] which discusses a Tennessee Court of Appeals case called *Swafford v. Memphis Individual Practice Association*.[44] In *Swafford*, a physician sued a health maintenance organization for libel because it had filed a report with the National Practitioner Data Bank stating that the physician, Dr. Swafford, had been terminated for providing allegedly substandard care. Information in the Data Bank is confidential and can be accessed only by certified health care entities and only upon request. At least three health care entities requested and accessed the report on Dr. Swafford.

The defendants moved for summary judgment in part on statute of limitations grounds, which the trial court granted. On appeal, the court considered whether the single publication rule should apply to the facts of the case. The defendants argued that it should, asserting that once the report was filed with the Data Bank, it became openly accessible to the public, similar to a book or newspaper. The appellate court disagreed, holding that the single publication rule did not apply and that each time the report was disseminated to a requesting health care entity a separate cause of action arose with its own limitations period.

In *Nationwide Bi-Weekly*, the Fifth Circuit distinguished *Swafford*, noting that it "involved a restricted-access online database" and the information at issue "was not publicly available and 'could hardly be considered an aggregate communication comparable to typical

---

[43] *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137 (5th Cir. 2007).
[44] *Swafford v. Memphis Individual Practice Ass'n*, No. 02A01-9612-CV-00311, 1998 WL 281935 (Tenn. Ct. App. June 2, 1998).

Internet publication.'"[45] TMR reads these cases to establish a distinction between publicly available information and information placed within a restricted-access online database. And from this distinction, TMR argues that the single publication rule does not apply to a publication that must be accessed by private registration and demand.

The Court finds the reasoning of *Swafford* unpersuasive. Some courts have refused to follow it even when the allegedly defamatory information exists on the Internet only within a restricted-access online database. In *Rare 1 Corp. v. Moshe Zwiebel Diamond Corp.*,[46] the court addressed the question of whether the single publication rule applied to comments posted on a private, subscriber-only website for jewelry trade and business professionals. The court held that the single publication rule applied, despite the fact that the comments were published on a restricted-access online database.[47]

As a policy matter, if the broad rule that TMR extracts from *Swafford* were followed, it could leave online publishers with paywalls, login pages, or other forms of restricted access without the protection of the single publication rule. The Court declines to draw such a distinction. To do so would vitiate the purposes of the single publication rule, which are to prevent the endless retriggering of the statute of limitations, protect defendants from harassment through multiple suits, and reduce the drain of libel cases on judicial resources.[48] In addition, imposing the multiple publication rule on Internet publishers that erect paywalls or other forms

---

[45] *Nationwide Bi-Weekly Admin., Inc.*, 512 F.3d at 143 (quoting *Oja*, 440 F.3d at 1133).

[46] *Rare 1 Corp. v. Moshe Zwiebel Diamond Corp.*, 822 N.Y.S.2d 375 (N.Y. Sup. Ct. 2006).

[47] *Id.* at 377-78.

[48] *Nationwide Bi-Weekly Admin., Inc.*, 512 F.3d at 144 (citing *Firth*, 775 N.E.2d at 466); *see also Diamond Ranch Acad., Inc.*, 2016 WL 633351, at *8.

of restricted access would place "a serious inhibitory effect on the open, pervasive dissemination of information and ideas" that such publishers could offer.[49]

But even assuming that *Swafford* was correctly decided, it does not apply to the present case. In a footnote to the sentence wherein the *Swafford* court held that the single publication rule did not apply to the facts of the case, it stated: "We do not address a situation in which the information in the Data Bank could be accessed by the general public."[50] Other courts have similarly recognized the limitation on *Swafford*'s holding.[51] Consequently, *Swafford*'s holding cannot be extended beyond situations where information on the Internet is inaccessible to the general public. Because the Roberts Paper was not placed within a restricted-access online database that made it unavailable to the general public, *Swafford* is inapplicable to the facts of this case.

The Court concludes that the single publication rule applies to the Roberts Paper and the Heinerman Videos. Accordingly, the one-year statute of limitations began to run from the date they were originally published on the Internet. For the Roberts Paper, which was published in July 2010 and republished in August 2010, the statute expired in August 2011. For the First Heinerman Video, which was published in April 2011, and the Second Heinerman Video, which was published in August 2011, the statute expired in April 2012 and August 2012, respectively. Absent any evidence of additional republication, TMR's proof of claim would be filed outside the limitations period and therefore time-barred.

---

[49] *Firth*, 775 N.E.2d at 466.

[50] *Swafford*, 1998 WL 281935, at *8 n.8.

[51] *See Clark*, 617 F. App'x at 504 ("[E]very court in the country that has considered *Swafford* has observed that its holding does not apply to information that is available online to the general public."); *Oja*, 440 F.3d at 1133 ("Unlike a typical Internet publication, the information at issue in *Swafford* was not available for the general public to access, nor could any unregistered and non-specific entities access the registered databank.").

**B. Evidence of Republication.**

TMR's remaining argument on summary judgment is that the alleged defamatory statements in this case were republished and that the republications occurred within the one-year statute of limitations. Republication "is an exception to the single publication rule,"[52] and it "occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely a delayed circulation of the original edition."[53] When a statement is republished, the statute of limitations runs anew from the date of republication.[54] "In the traditional print context, the critical consideration is not whether the substance of the statement has changed. Instead, the key factor is whether the speaker intended to and does reach a new audience."[55] Illustrative examples of republication include publishing a second edition of a book,[56] publishing a paperback edition of a book originally published in hardcover,[57] rebroadcasting a television show,[58] or giving a motion picture a second run in theaters.[59]

Determining whether a defamatory statement has been republished on the Internet is not as straightforward. "Because online fora and content delivery systems are frequently altered, many courts have struggled to parse whether specific technological changes in the format and delivery of allegedly defamatory statements have functioned to republish the statements to new audiences . . . . Generally, the courts agree that republication must at least involve an 'affirmative

---

[52] *Diamond Ranch Acad., Inc.*, 2016 WL 633351, at *10.
[53] *Firth*, 775 N.E.2d at 466 (citation and internal quotation marks omitted).
[54] *Nationwide Bi-Weekly Admin., Inc.*, 512 F.3d at 146; *see also Davis v. Mitan (In re Davis)*, 347 B.R. 607, 611 (W.D. Ky. 2006) ("Republishing material . . . resets the statute of limitations.").
[55] *Clark*, 617 F. App'x at 505 (citation and internal quotation marks omitted).
[56] *Firth*, 775 N.E.2d at 466.
[57] *Nationwide Bi-Weekly Admin., Inc.*, 512 F.3d at 146.
[58] *Clark*, 617 F. App'x at 505.
[59] Restatement (Second) of Torts § 577A cmt. d (Am. Law. Inst. 1977).

act.'"[60] For example, "where substantive material is added to a website, and that material is related to defamatory material that is already posted, a republication has occurred."[61] But if a statement is "posted to a generally accessible website," it is not republished by:

- a third party's posting the statement elsewhere on the internet,
- passively maintaining the website to which the defamatory statement is posted,
- failing to remove a statement from a website after receiving notice of its falsity,
- adding an unrelated story to the web page that hosts the allegedly defamatory statement,
- creating hypertext links to previously published statements,
- revising other information at the URL at which the allegedly defamatory statement is found, but leaving the statement itself intact,
- updating a website's user interface to give visitors additional avenues to access the allegedly defamatory statements, or
- changing the URL at which the allegedly defamatory statement was posted (*i.e.,* posting the statement verbatim to a new URL).[62]

Ultimately, "the test of whether a statement has been republished is if the speaker has affirmatively reiterated it in an attempt to reach a new audience that the statement's prior dissemination did not encompass."[63]

### 1. MRI Did Not Republish the Roberts Paper by Relocating It to a Restricted-Access Area of Its Website.

TMR has argued that if MRI removed the Roberts Paper from the publicly-accessible portion of its website and placed it behind a login page, that would constitute a republication because the Roberts Paper would be reaching a different, targeted audience. The Court does not have to determine whether taking a publicly-available statement and subsequently narrowing access to it constitutes a republication because, as discussed in section II.A, *supra*, MRI never made the Roberts Paper available behind a login page on its website. Instead, it removed the

---

[60] *Clark*, 617 F. App'x at 505.
[61] *In re Davis*, 347 B.R. at 612.
[62] *Clark*, 617 F. App'x at 505 (citations omitted). *But see Rare 1 Corp.*, 822 N.Y.S.2d at 377 (relocating defamatory material to a second website can constitute republication).
[63] *Clark*, 617 F. App'x at 505.

Roberts Paper completely. Because the Roberts Paper was not made available to a new audience on MRI's website, there was no republication of the Roberts Paper on MRI's website.

**2. A Google Search for the Roberts Paper Does Not Constitute Republication.**

TMR next argues that because Google has cached a version of the Roberts Paper in HTML format, every time a person searches for the paper on Google, the paper is republished. The Court disagrees. The HTML version of the Roberts Paper retrieved by a Google search is not a subsequent publication intended to reach a new audience. It is not a new edition disseminated at the behest of MRI. It is merely the same version of the paper, which has been stored by a third party. In that sense, it is similar to an edition of a newspaper contained on microfiche. Like microfiche, Google catalogues and stores documents published by various entities. And just as a person can access a publication by looking through microfiche at a library, so too can a person access a publication in HTML format on Google. But searching on Google does not constitute a republication any more than searching sheets of microfiche does. To hold otherwise would eviscerate the single publication rule. Given the ubiquity of Google searches, the statute of limitations would never expire. The Court declines to limit the single publication rule in this way.

**3. Other Alleged Instances of Republication of the Roberts Paper.**

TMR offers two additional arguments why summary judgment is not appropriate as to the Roberts Paper. First, it argues that MRI failed to carry its burden of production on summary judgment with respect to the Roberts Paper on two issues: one, the dates and locations of publication and two, the dates and locations of republication. Second, it has provided a list of hyperlinks where the Roberts Paper was purportedly republished. Like the first, this argument also deals with whether the parties have properly carried their burdens on summary judgment.

18

"When determining whether summary judgment should be granted as to a certain issue, a court must consider who will bear the ultimate burden of persuasion on that issue at trial."[64] A trial in this case would consist of an objection to claim, which would place on TMR the ultimate burden of persuasion of proving the validity and amount of its claim.[65] Therefore, while MRI is the moving party on summary judgment, it would not have the ultimate burden of persuasion at trial.[66]

> If a moving party that would not have the burden of persuasion at trial files a properly supported motion for summary judgment and shows that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial, and the nonmoving party fails to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial, then entry of summary judgment is mandated.[67]

The Court concludes that MRI carried its burden with respect to the dates and locations of publication. MRI's motion clearly articulates that the Roberts Paper was published on the Internet on July 26 and 27, 2010, and the motion is supported by Bruce Anderson's affidavit on

---

[64] *Eaves v. Fireman's Fund Ins. Cos.*, 148 F. App'x 696, 699 (10th Cir. 2005).

[65] *See In re Castle Arch Real Estate Inv. Co.*, 2013 WL 1603319, at *8. At oral argument, TMR conceded that it would have the burden at trial to show when the Roberts Paper was published.

[66] The parties have not addressed the argument that MRI would bear the burden at trial to show that TMR's claim was filed outside the limitations period. *See Diamond Ranch Acad., Inc.*, 2016 WL 633351, at *8 ("In a defamation case the statute of limitations is an affirmative defense, and the defendant has the burden to show that the claim is time-barred."). Even if MRI did bear that burden, that would not alter the outcome of the Court's decision. A party moving for summary judgment that bears the ultimate burden of persuasion on an issue at trial "must submit enough evidence in support of its motion that it would be entitled to a directed verdict at trial if the evidence is not controverted." *Eaves*, 148 F. App'x at 699. The Court concludes that MRI has met this standard.

[67] *Eaves*, 148 F. App'x at 700 (citations and internal quotation marks omitted); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) ("The moving party has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law. The movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.") (citations and internal quotation marks omitted).

this point.[68] As an aggregate publication widely disseminated to the general public, the Roberts Paper was reasonably discoverable as a matter of law—and therefore the statute of limitations began to run—from the date of publication. MRI later republished the Roberts Paper in August 2010. Absent a subsequent republication, MRI has established that the statute of limitations to bring a defamation claim with respect to statements in the Roberts Paper expired in August 2011.

With regard to whether MRI has carried its burden on the dates and locations of republication, TMR has essentially argued that it is insufficient for MRI to merely argue that there were no republications; instead, MRI should have come forward and said *when* any alleged instances of republication occurred. The Court concludes that MRI satisfied its burden by showing the original dates of publication of the Roberts Paper and affirmatively demonstrating the absence of evidence in the record to support republication. TMR then bore the burden to designate specific facts showing that there is a genuine dispute as to whether the Roberts Paper was republished at a point in time recent enough to support its defamation claim.

TMR has not met this burden. It has referred to a number of websites where it asserts that the Roberts Paper can be found in some form. These websites do not provide evidence of republication—there is no basis to reasonably infer that MRI was involved in placing the Roberts Paper on the websites. But even if the Court treated the websites as republications, TMR has not shown when it believes the republications occurred. Based on the record before it, the Court cannot reasonably infer that these websites show republications made within the limitations period. On summary judgment, the Court is asked to determine if a reasonable fact finder could return a verdict in the nonmovant's favor based on the evidence before it. The Court determines

---

[68] Docket No. 14, Affidavit of Bruce Anderson in Support of Motion for Summary Judgment, ¶ 9.

that a reasonable fact finder could not find that the Roberts Paper was republished at a time that would support TMR's claim.

MRI has carried its burden on summary judgment to show a lack of a genuine dispute as to when the Roberts Paper was published and has shown an absence of evidence to support republication. Because TMR has not come forward with sufficient evidence to create a genuine dispute on the issue of whether the Roberts Paper was republished recently enough to make its proof of claim timely, the Court concludes that the statute of limitations expired as to the Roberts Paper well before TMR filed its proof of claim. Consequently, any portion of TMR's claim attributable to that paper is disallowed.

### 4. Alleged Instances of Republication of the Heinerman Videos.

MRI has established, and TMR has not contested, that the First Heinerman Video was published on YouTube in April 2011 and the Second Heinerman Video was published on YouTube in August 2011. As aggregate publications widely disseminated to the general public, the Heinerman Videos were reasonably discoverable as a matter of law—and therefore the statute of limitations began to run—when they were posted on YouTube.[69] Accordingly, the statute of limitations expired in April 2012 for the First Heinerman Video and in August 2012 for the Second Heinerman Video. Because MRI did not file its bankruptcy case until September 2013 and TMR did not file its claim until January 2014, TMR is time-barred from bringing a cause of action on the original publications of the Heinerman Videos.

---

[69] Although MRI published links to the Heinerman Videos on its website shortly after the videos were posted on YouTube, "creating hypertext links to previously published statements" is not considered a republication. *Clark*, 617 F. App'x at 505.

TMR argues, however, that the First Heinerman Video was republished by Alexander Herrera on July 19, 2013, which was within a year of when TMR filed its proof of claim. TMR believes that Mr. Herrera performed the republication at the behest of MRI.

In support of its motion for summary judgment, MRI produced the affidavit of Matthew Anderson, who is a vice-president of MRI. In relevant part, the affidavit states that to the best of Mr. Anderson's knowledge, "no one at MRI (or who is affiliate[d] with MRI) knows Alexander Herrera, . . . has ever communicated with Mr. Herrera, . . . has had any affiliation with Mr. Herrera whatsoever or has had anything whatsoever to do with Mr. Herrera's re-publication of [the First Heinerman Video] on the Internet."[70] Through the affidavit, MRI has properly supported its position on the material fact of whether MRI was behind Mr. Herrera's reposting of the First Heinerman Video. The affidavit establishes that MRI was not behind the reposting. The burden therefore shifts to TMR to demonstrate a genuine dispute as to this fact.[71]

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [fact finder] to return a verdict for that party."[72] TMR disputes what Mr. Anderson said in his affidavit, but has not provided any evidence to contradict it. TMR's belief that MRI was behind the Herrera reposting does nothing more than introduce some metaphysical doubt as to that fact, which is insufficient on summary judgment. TMR has stated that it attempted to serve Mr. Herrera with a subpoena, but could not find him, and that it attempted to depose Mr. Anderson, but did not. TMR has not requested additional time for discovery.

---

[70] Docket No. 15, Affidavit of Matthew Anderson in Support of Motion for Summary Judgment, ¶ 13.

[71] In fact, TMR admitted at oral argument that MRI had met its burden under *Celotex* with regard to that specific issue.

[72] *Anderson*, 477 U.S. at 249.

A third party's posting of a defamatory statement elsewhere on the Internet does not constitute republication.[73] There is no genuine dispute that MRI was not behind the Herrera reposting of the First Heinerman Video. Because Mr. Herrera was merely a third party who reposted allegedly defamatory material, the Court concludes that his reposting does not constitute a republication of the First Heinerman Video. Therefore, the statute of limitations as to that video did not begin to run anew when it was reposted. TMR has not identified any other alleged republications of the Heinerman Videos.[74] Accordingly, the Court concludes that the statute of limitations expired as to the Heinerman Videos well before TMR filed its proof of claim, and any portion of TMR's claim attributable to those videos is disallowed.

## III. CONCLUSION

The claims in TMR's proof of claim were asserted beyond the applicable statute of limitations under Utah law, and the Court will disallow claim #22-1 in its entirety on that basis. Accordingly, the Court does not need to address MRI's alternative basis to disallow TMR's claim, *i.e.*, that TMR agreed to release and waive the damage claims asserted therein. A separate Order and Judgment will be issued in accordance with this Memorandum Decision.

_____END OF DOCUMENT_____



---

[73] *Clark*, 617 F. App'x at 505.

[74] Although the Heinerman Videos remained on MRI's website through the petition date, "failing to remove a statement from a website after receiving notice of its falsity" does not constitute republication. *Clark*, 617 F. App'x at 505.

_____ooo0ooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

Zane S. Froerer          zane.froerer@froererlaw.com, law.reception@froererlaw.com
Donald L. Dalton        daltonandkelley@msn.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

- None.